NOT FOR PUBLICATION

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

———————————————————— :
:
CERTAIN UNDERWRITERS AT  :
LLOYD'S, LONDON,  :
:
      Plaintiff,  :       Civil No. 19-4662 (RBK/AMD)
:
      v.  :       **OPINION**
:
170 ESTELL MANOR, LLC  :
:
      Defendant.  :
———————————————————— 

**KUGLER**, United States District Judge:

Presently before the Court is Plaintiff Certain Underwriters at Lloyd's, London's Motion for Summary Judgment (Doc. No. 57). For the reasons set forth below, Plaintiff's Motion for Summary Judgment is **GRANTED**.

## I.    BACKGROUND

This case concerns whether property located in Estell Manor, New Jersey was "under renovation" at the time it was vandalized such that any damages sustained by the theft and vandalism are covered by the insurance policy.

### A.  Factual Background

On May 9, 2017, 170 Estell Manor, LLC purchased a commercial property located at 170 Route 50, Estell Manor, New Jersey. (Doc. No. 57-2, Plaintiff's SOF at ¶¶ 1, 3); (Doc. No. 59-13, Defendants' Response to SOF at ¶¶ 1, 3). The property was intended to be used as a behavioral health substance abuse clinic and was unoccupied at the time of purchase. (*Id.* at ¶ 3). It continued to remain unoccupied after the loss occurred. (Doc. No. 59-2, Dep. at 14:1–14:5).

After receiving an application submitted on behalf of Estell Manor, Lloyd's issued a Commercial Property Insurance Policy which became effective on July 28, 2017 and ended July 28, 2018. (*Id.* at ¶ 5). The Policy's "Building and Personal Property Coverage" section provides "[w]e will pay for direct physical loss of or damage to" the building located at 170 Route 50, Estell Manor, New Jersey. (Doc. No. 59-9, Exhibit H at 38). Under subsection E of the "Building and Personal Property Coverage" form, which is entitled "Loss Conditions," Lloyd's provides that it will not pay for any loss or damage caused by vandalism, theft, or attempted theft "[i]f the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs." (*Id.* at 49). The Policy defines a building as vacant "unless at least 31% of its total square footage is . . . used by the lessee or sublessee [or building owner] . . . to conduct customary operations." (*Id.*). However, buildings under construction or renovation are not considered vacant. (*Id.*).

Prior to purchase of the property, Estell Manor retained the services of 5-Fold Technical Consultants to inspect the property and determine the scope, cost, and extent of renovations. (Doc. No. 59-3, Exhibit B). It issued a report on May 3, 2017, recommending, among many other changes, "complete replacement of all heating and cooling units," cleaning and repainting of exterior doors, and repairing the gutters. (*Id.* at 4–5). In addition to inspecting the property, 5-Fold also assisted Estell Manor in locating subcontractors to perform the necessary repairs. (Doc. No. 59-2, Exhibit A at 36). Throughout July and August of 2017, several subcontractors toured the property to provide quotes for the prospective renovations. (Doc. No. 59-7, Exhibit F at 2–3). Also during this time, Estell Manor hired an architect to design floor plans for the property and to ensure compliance with New Jersey law, employed a landscaper, and consulted with a sceptic engineer. (Doc. No. 59-6, Exhibit E at 2; Exhibit C; Exhibit D; Exhibit E). On October 2, 2017,

Mr. Chatten—the property manager for Estell Manor—met with a contractor at the building to evaluate and measure for a new HVAC system, which lasted three and half hours. (*Id.* at 3).

At some point in time between November 1, 2017 and February 14, 2018, the property was "broken into and vandalized," causing approximately $500,000 to $600,000 worth of damage. (Doc No. 59-11, Exhibit J at 8).[1] Despite Estell Manor's preparations, Ms. Garcia, the director of facility services and procurement for Estell Manor, testified that no work had been performed on the property prior to November 1, 2017:

> Dan Strick: was any of the renovation *work* started before November 2017?
>
> Ms. Garcia: Well, we got quotes. We started getting quotes since we bought the property. So we started getting quotes, I believe it was even prior to us signing the contract. It was May, June, July, August. For several months we were getting different quotes from contractors.

(Doc. No. 59-2, Exhibit A at 15) (emphasis added). Even after the property was vandalized, Ms. Garcia confirmed that no work had been performed on the property yet:

> Dan Strick: have you received any estimates for work to be done at the property after the vandalism and theft?
>
> Ms. Garcia: Yes.
>
> Dan Strick: And has work actually started yet?
>
> Ms. Garcia: They are in the process of obtaining permits.

(*Id.* at 52). Estell Manor obtained its first permit to perform electric work on the property on December 18, 2018, and was still in the process of obtaining other permits at the time of Ms.

---

[1] The post loss inspection report by Engle, Martin & Associates improperly attributes some loss to the vandalism and theft when it is clear that such defects in the property existed prior to the loss. For instance, it notes that faucets and valves were stolen from all bathrooms and showers, however, the report generated by 5-Fold establishes that these faucets and valves were missing prior to the vandalism and theft. (Doc. No. 59-3, Exhibit B at 59–62; Exhibit J at 11, 79–81).

Garcia's testimony—January 3, 2019. (Doc. No. 57-13, Exhibit H); (Doc. No. 59-2, Exhibit A at 51).

On May 16, 2018, Estell Manor submitted a property loss claim to Lloyd's, but the claim was denied on February 5, 2019. (Doc. No. 57-15, Exhibit J). Lloyd's denial of coverage letter indicated that there was no coverage under the insurance policy for the theft and vandalism because the property had been vacant for 60 consecutive days before the loss and there was not a central burglar alarm in complete working order at the property at the time of the loss. (*Id.*).

### B. Procedural History

Lloyd's commenced this declaratory judgment action by filing a Complaint in this Court on February 5, 2019. (Doc. No. 1). Lloyd's later filed an Amended Complaint on June 12, 2019. (Doc. No. 14). In response, Estell Manor filed an Answer and Counterclaim on July 2, 2019, to which Lloyd's filed an Answer on July 16, 2019. (Doc. No. 17, 19). Although pretrial factual discovery was not scheduled to close until November 30, 2019, Lloyd's filed a motion for summary judgment on September 24, 2019. (Doc. No. 22). It was denied on April 14, 2020, and after discovery ended, Lloyd's filed the present, renewed motion for summary judgment. (Doc. No. 44, 57). Estell Manor opposes this motion. (Doc. No. 59).

## II. LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Id.* The movant bears the burden of showing the absence of a "genuine issue of material fact." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d

Cir. 1996). The party may satisfy its burden by "produc[ing] evidence showing the absence of a genuine issue of material fact" or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant makes this showing, the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). Instead, the nonmovant must "point to concrete evidence in the record that supports each and every essential element of his case." *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995).

"When opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co*., 311 F.3d 226, 233 (3d Cir. 2002). The Court's role is not to weigh the evidence and decide the truth, but to determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In making that decision, "[a]ll facts and inferences are construed in the light most favorable to the non-moving party," *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998), and credibility determinations are for the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc*., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. DISCUSSION

The fight in this case centers on two independent grounds each of which is sufficient for Lloyd's to deny coverage: (1) whether the building located at 170 Route 50, Estell Manor, New Jersey, was "under renovation" and therefore "vacant" within the terms of the Policy; or (2) whether Estell Manor maintained a central station burglar alarm in complete working order. Because we find that the building located at 170 Route 50, Estell Manor, New Jersey was not

"under renovation" within the meaning of the Policy and was therefore vacant for at least 60

consecutive days before the vandalism and theft occurred, we need not address the latter ground.

### A. Meaning of the Phrase "Under Renovation"

Naturally, we start with the first analytic step—the meaning of the phrase "under

renovation." Plaintiff argues that "[s]imply having plans to make changes or repairs does not

equate to being 'under renovation.'" Instead, according to Plaintiff, there must be ongoing

activity at, and work done to the property. Defendant, on the other hand, contends the phrase

"under renovation" when juxtaposed with the phrase "under construction" indicates that

"renovation" is meant to have a broader meaning. Thus, while under construction means

"building something new," the phrase "under renovation" means the ongoing process in which a

property owner is taking steps to restore the subject property and does not require that the

"activity in question exceed any particular level of substantiality." Defendant therefore

emphasizes that the phrase "under renovation" constitutes *the process* of repairing and improving

something, especially a building. In the alternative, Defendant argues that because the phrase

"under renovation" does not refer to a discrete act or whether actual work need be performed at

the property, the Court should find it ambiguous.

A court's interpretation of an insurance contract is a determination of law. *Cypress Point

Condo. Ass'n, Inc. v. Adria Towers, L.L.C.*, 441 N.J. Super. 369, 375 (App. Div. 2015). On this

score, when interpreting an insurance contract, the basic rule is to determine the intention of the

parties from the language of the policy, giving effect to all parts so as to give a reasonable

meaning to the terms. *State Nat. Ins. Co. v. Cty. of Camden*, 10 F. Supp. 3d 568, 574 (D.N.J.

2014). When the terms of the contract are clear and unambiguous, the court must enforce the

contract as it is written; the court cannot make a better contract for parties than the one that they themselves agreed to.

The plain language of the policy states "[b]uildings under construction or renovation are not considered vacant." The phrase "under renovation" is not defined in the policy. Accordingly, we turn to the dictionary to determine the meaning of this phrase. *Posco Daewoo Am. Corp. v. Allnex USA, Inc*., No. CV 17-483, 2018 WL 6077983, at *4 (D.N.J. Nov. 19, 2018) (noting courts may look to a dictionary to determine the plain meaning of an undefined term). Merriam Websters dictionary defines "renovation" as "to restore to a former better state (as by cleaning, repairing, or rebuilding)." Merriam-Webster Online Dictionary, 2021, https://www.merriam-webster.com/dictionary/renovation (June 3, 2021). As Defendant notes, the word "renovation" is modified by the word "under" which it argues means "in or into a position below or beneath something" or "below or short of some quantity, level, or limit." However, we fail to see how this would help the Court determine the meaning of the phrase "under renovation" and Defendant offers no explanation.[2] Instead, the better definition of "under" is "receiving or undergoing the action or effect of" because it comports with the plain meaning of the vacancy exclusion in that they both intimate that some level of activity needs to occur at the building.

This understanding of "under renovation" can be extracted from the policy exclusion itself. To paraphrase, the Policy states that a building is not considered "vacant" if it is "under construction or renovation." The reason for this is obvious: a building is not vacant when it is under construction or renovation because there is some level of activity occurring there. *Belich v. Westfield Ins. Co*., No. 99-L-163, 2001 WL 20751, at *3 (Ohio Ct. App. Dec. 29, 2000)

---

[2] Perhaps Defendant is citing this definition of "under" to suggest that renovation does not require activity to exceed any particular level of substantiality. But we would ask Defendant to transpose their definition of the word "under" into the phrase in the policy and ask them if it makes sense.

(reasoning "[r]enovation contemplates something being done *at the building,* not merely planning to renovate, remodel, or refurbish"). This interpretation comports with the Policy's other definition of "vacancy" as it requires "at least 31% of its total square footage [to be] . . . used by the lessee or sublessee [or building owner] . . . *to conduct customary operations*" and aligns with the 60-day temporal requirement. Both drive toward the conclusion that activity must occur at the building.

Obviously, any activity will not do. The activity must also change or repair the building to a better state for it to constitute "renovations." *1 W. Main St., LLC v. Tower Nat'l Ins. Co.*, No. CV 14-6967, 2016 WL 1043545, at *7 (E.D. Pa. Mar. 15, 2016) (concluding the presence of blueprints demonstrated the plaintiff planned to renovate the building, but because the plans did not actually change or repair the building in any manner, it was not under renovation); *The Farbman Grp. v. Travelers Ins. Companies*, No. 03074975, 2006 WL 2805646, at *5 (E.D. Mich. Sept. 28, 2006) (concluding the walkway removal project underway at the Lorna Building, which involved removing the walkway and restoring the façade of the building, at the time of the flooding qualified as "renovation"). Nevertheless, "an activity could be so minimal in its degree or scope as to fail to constitute 'renovation,'" such as "[r]eplacing a single light fixture with one used in a bygone era." *The Farbman Grp. v. Travelers Ins. Companies*, No. 03074975, 2006 WL 2805646, at *9 (E.D. Mich. Sept. 28, 2006). With the contours of this phrase established, we will briefly address why it is not ambiguous.

Defendant contends that the phrase "under renovation" is ambiguous because it envisions a process, rather than a singular discrete act, and it does not refer to whether actual work was performed at the property. In so many words, Defendant's argument is effectively that the phrase is ambiguous because there is no definition. This does not render a phrase ambiguous. *Kostera v.*

*Bacharach Inst. for Rehab.*, No. A-1991-13T4, 2015 WL 4643642, at *16 (N.J. Super. Ct. App. Div. Aug. 6, 2015) (explaining "a word or phrase is not automatically rendered ambiguous simply because the policy fails to define it."). A policy is ambiguous when it is susceptible to more than one *reasonable* interpretation. *Colby Rest. Grp., Inc. v. Utica Nat'l Ins. Grp.*, No. CV 20-5927 (RMB/KMW), 2021 WL 1137994, at *4 (D.N.J. Mar. 12, 2021); *see also Royal Ins. Co. of Am. v. KSI Trading Corp.*, 563 F.3d 68, 73 (3d Cir. 2009) (noting a genuine ambiguity exists "where the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage."). Under Defendant's proposed definition, a building is "under renovation" even though no work is currently being performed on the building, no physical repairs or changes have been made to it, and no contractors or subcontractors are on site simply because there are plans to renovate the building. That is like saying a castle is "under siege" when an army still has to march twenty miles down the road or a squadron is "under fire" from enemy combatants before a single bullet is fired—neither are reasonable interpretations. Therefore, we find that the phrase "under renovation" is not ambiguous.

### B. The Property was Not "Under Renovation"[3]

Plaintiff maintains the property was not "under renovation" because there is no evidence that Estell Manor retained a general contractor or any subcontractor at the time of the loss, no work permits had been approved, no work had begun, and designs had not been finalized. Defendant argues the property was "under renovation" because prior to the loss it hired an

---

[3] Defendant asserts Plaintiff's interpretation of the phrase 'under renovation' is so narrow it would effectively render coverage illusory. This is wrong. First, this is a contradiction in terms. An interpretation that renders coverage "*effectively* illusory"—that is, nearly or close to illusory but not completely—is by definition not illusory. Second, simply because the phrase "under renovation" applies in a narrower set of circumstances than Defendant would like does not mean the insurer has unfettered discretion to deny coverage. As Defendant is well aware from the many cases it cites, when changes or repairs are being performed on the property, the insurer has but one option when a loss occurs—provide coverage. Thus, we fail to see how this interpretation renders Plaintiff's promise no promise at all.

architect, a landscaping company, a maintenance man, measured for new HVAC systems, and was receiving bids from subcontractors. We do not doubt that Defendant intended to renovate the building, but it simply cannot make a "silk purse out of a sow's ear." The facts are what they are, and they are not favorable to Defendant.

Prior to the loss, the most that Defendant had done was hire an architect, landscaping company, maintenance man, measure for new HVAC systems, and receive bids from subcontractors for the prospective renovations. This simply constitutes plans to renovate. *1 W. Main St., LLC v. Tower Nat'l Ins. Co*., No. CV 14-6967, 2016 WL 1043545, at *7 (E.D. Pa. Mar. 15, 2016) (concluding "[s]imply having *plans* to make changes or repairs does not equate to being 'under renovation,' especially when the permits necessary to make such changes or repairs have not even been sought."). It is undisputed that prior to the loss, no building permits had been submitted or granted and no restorative changes or repairs had been made to the building. In fact, even the cases cited by Defendant belie their contention that the building was "under renovation." In *Edward & Edna Elbaor Fam. Partn*., the building was being painted, in *The Farbman Grp*., a walkway was removed, and the façade of the building was restored, and in *Belich,* a stage and coat rack were removed from the property. In each of these cases, some change or repair had been made to the property. The same cannot be said here. And Defendant's own witness confirmed this when she testified that no work had been performed on the property prior to the alleged loss or even at the time of her deposition—January 3, 2019. (Doc. No. 59-2, Exhibit A at 15, 52). Therefore, it is evident that the building here was not "under renovation" prior to or at the time of the vandalism and theft. Accordingly, there is no dispute of "material" fact.

Defendant attempts to undermine the credibility of its own witness, Ms. Garcia, by suggesting that she was not familiar with the property, the key details of the renovation project, and had only visited the property after it was vandalized. They also point to her transcript where she supposedly "confirmed [that] not all contractors who may have done work at the [p]roperty were reported to the company before the vandalism occurred." We can only assume this is an attempt to artificially manufacture a "genuine" dispute of material fact. Neither is sufficient. No reasonable jury could find that the property was "under renovation" simply because a contractor, who was supposed to provide a *quote* to Defendant, visited the property prior to the loss and did not specify what he did at the property. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986) (explaining that "if the evidence is merely colorable or is not significantly probative, summary judgment may be granted."). The same reasoning applies with respect to Defendant's attempt to undermine Ms. Garcia's testimony and is further undercut by the fact that Defendant simultaneously relies on her testimony to dispute certain facts but then suggests it is unreliable. Defendant is clutching at straws and fails to raise a "genuine" dispute of material fact.

### C.  The Building Was Vacant For More than Sixty Days Before the Loss

Because we held that none of the above referenced activities constituted "renovations" within the meaning of the Policy and there is no dispute that the property was unoccupied, it is clear that the property was vacant for more than sixty days prior to the vandalism and theft. Therefore, the vacancy provision applies and Plaintiff "will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss: (a) Vandalism . . . [and] (e) Theft."

## IV.    CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment is granted. An appropriate order follows.

Dated: 6/16/2021                                              s/ Robert B. Kugler
                                                             ROBERT B. KUGLER
                                                             United States District Judge